## Obadiah Sands v. Charles H. Potter.

1. CONTRACTS—*Abrogation of, by Parties Incorporating.*—The fact that a contracting party causes to be formed a corporation to carry on his business, does not necessarily abrogate contracts with his employes regarding the business, especially where the contractor becomes presi-

Sands v. Potter.

dent and treasurer of the corporation without bond and continues to receive the services of the employe without asking him to transfer his contract to the corporation.

2. SAME—*Abrogation by Insanity.*—A contract is not abrogated because the contracting party becomes insane.

3. SAME—*Practice—Admissibility under the Common Counts.*—While a contract continues executory the plaintiff must declare specially; but when it has been performed on his part and nothing remains to be done under it but the payment of the compensation by the defendant, the plaintiff may declare in *indebitatus assumpsit,* and the contract may be read in evidence for the purpose of showing its terms and measure of damages.

4. SAME—*Measure of Damages—Waiver.*—In an action upon a contract for services, the measure of damages is fixed by the contract itself without reference to the form of the action or the counts of the declaration, and the party suing does not waive his rights to insist on the contract as the measure of damages by introducing evidence in rebuttal tending to show what his services were reasonably worth.

5. PRACTICE—*Opening Statements.*—It is the practice in this State to require the opening statements by both plaintiff and defendant to be made before the evidence is submitted to the jury.

6. INSANITY—*Sufficient to Avoid a Contract.*—To prove a person insane, or to be in want of mental capacity to contract, it must be shown by a preponderance of the evidence that at the time he executed the contract he had such a degree of mental weakness as to be incapable of understanding what he was doing, and unable to comprehend and understand the terms and effect of the contract.

**Indebitatus Assumpsit.**—Appeal from the Circuit Court of Kane County; the Hon. CLARK W. UPTON, Judge, presiding. Heard in this court at the December term, 1894. Affirmed. Opinion filed May 28, 1895.

CHAS. WHEATON and MARK SANDS, attorneys for appellant.

BOTSFORD & WAYNE and C. F. IRWIN, attorneys for appellee.

MR. JUSTICE LACEY DELIVERED THE OPINION OF THE COURT.

This was a suit by appellee on a contract with appellant, dated January 30, 1891, whereby the latter agreed to employ appellee for a period of three years for compensation of the sum of $1,800 per annum and payable monthly, and also

to pay five per cent of the first $20,000 of the profits of his butter and cheese and creamery business, and also ten per cent of the next $10,000 of the profits of his business, and twenty per cent on all profits in excess of $30,000 per annum, payable annually. The appellant had the option to terminate the contract at any time, by paying as damages for such termination $150 at the time of the terminaation, and pay appellee his percentage of the profits of the said business for the term of six months after the termination of such agreement. The case was tried before a jury and verdict for appellee for $14,000. Upon this verdict the court below rendered judgment for appellee. In addition to the verdict the appellee allowed a credit on his claim of $6,415.61. It is claimed that in addition to the written contract, by an agreement after its execution between the parties, appellee was to be allowed his reasonable expenses, and it was credited to him on appellant's books.

The declaration contains the common counts only. The appellee went into the employment of the appellant in pursuance of the contract, and remained in it until January 31, 1894, as claimed by him. Sullivan was the book-keeper during the entire time, and kept the books and furnished the appellee the figures of the creamery's profits during the time. ·The appellant was engaged in the business of butter and cheese making and selling, in the establishment at Elgin, carrying on the creamery business. The appellee worked for him at such work as he was directed, selling and buying butter, attending to the purchase and sales of butter, and watching the market on the Board of Trade in the city of Elgin, at times manipulating the market so as to raise the price of butter artificially, selling cheese, and such work as the appellant directed him. During these three years of appellee's employment the business was very successful, much more so than it had been previously, and the profits of the business were for the three years as follows, to wit: For 1891, $35,841.59; for 1892, $47,883.39; for 1893, $52,490.76; the transactions aggregating for the three years $600,000, $800,-

000 and $850,000 respectively. The defenses set up and assigned for causes for reversal are quite numerous, and as near as we can make them out from the voluminous statement of them, the appellant insists that the contract was void, because entered into by appellant while he was insane or without mental capacity sufficient to make a valid contract; that in the early spring of 1891 the business was organized into a corporation called The Elgin Creamery, and from that time the appellee was employed by that company, and was not in the employ of appellant; that in July or August, 1891, the appellant exercised the option in the contract and terminated it; that in the summer of 1891 the appellant became insane and was incapacitated to exercise the option reserved in the contract, and therefore the law would intervene to exercise it for him, if the contract was an unprofitable one, which it is insisted it was in this case. The appellant also insists that the court erred in its rulings as to the order and time of making the opening statement in the case; second, the court erred in allowing the plaintiff to introduce the special contract under the common counts of the declaration, and in permitting damages to be assessed on the basis of the contract; that the court erred in denying appellant's motion relative to the plaintiff's services rendered after the formation of the corporation; the court erred in refusing and giving instructions as asked to be given in the case and in giving certain of appellee's instructions.

As to the claim that the appellant was insane at the time he entered into the contract, we think the evidence justified the jury in finding him sane and with sufficient mental capacity to execute the contract. The point that the contract was abrogated because of the incorporation of the Elgin Creamery Company is not well taken. It was a mere nominal affair, and all business remained the same as before except the mere use of the name, and run by appellant, he having the entire interest, all the shares out of about five hundred except four or five which went one each to the directors to qualify them to act. The appellant was president and treasurer without bond and continued to receive

the services of appellee without asking him to transfer his contract to that corporation. Apparently the name of the company was all appellant desired. We do not think the point is well taken that the contract was abrogated because the appellant became insane. The jury was justified in believing the contract was an advantageous one for appellant, and appellee in common with other employes, performed the services of appellant while he was under a conservator.

The objection that the contract was not admissible because not specially declared upon can not be sustained. The contrary doctrine has been held in this State. Troop v. Sherwood, 4 Gil. 98; Lane v. Adams, 19 Ill. 167; Tunison v. Field, 21 Ill. 108; Adlard v. Muldoon, 45 Ill. 193.

It is settled by the above authorities that while a contract continues executory the plaintiff must declare specially; but when it has been performed on his part and nothing remains to be done under it but the payment of the compensation by the defendant, the plaintiff may declare in *indebitatus assumpsit*, and the agreement may be read in evidence for the purpose of showing its terms and measure of damages. The measure of damages is fixed by the contract without reference to the form of the action or the counts of the declaration.

The appellee did not waive his rights to insist on the contract as a measure of damages, because he introduced evidence in rebuttal tending to show what appellee's services were reasonably worth. In certain contingencies this might have been the measure of damages. The appellee was properly allowed to recover his expenses in addition to the compensation named in the agreement by reason of his subsequent contract. The basis of computing profits was adopted by appellant himself through his bookkeeper, and we think was the proper one and the one contemplated by the contract.

The claim that appellant discharged appellee in the spring of 1891, was found by the jury not sustained by the evidence.

The jury heard the evidence on this point and found for appellee under proper instructions from the court, and we see no reason to find fault with the verdict in that respect. In regard to the opening statement as desired to be held by the appellant by the court below and the ruling of the court thereon, we think there was no error, and if error, not of sufficient importance to reverse. Counsel for the appellant made an opening statement to the jury, and the time of making it was not important. We do not wish to be understood as holding that the ruling of the court that both opening statements should be made before the evidence was submitted to the jury, was erroneous. That is the practice of the Circuit Courts in this State, so far as we know, and has been for many years. There was no error of the court that we can see in excluding incompetent evidence. There was no error in giving or refusing instructions. Appellee's instructions are complained of as having omitted to tell the jury that appellants should have mind enough to protect his interest. We think there was no error in those instructions; they amounted to that in substance. The first of appellee's instructions told the jury that to prove appellant insane, or to be in want of mental capacity to contract, he must show by a preponderance of the evidence " that at the time he executed the contract, he had such a degree of mental weakness that he was incapable of understanding what he was doing, and unable to comprehend and understand the terms and effect of the contract, or that the same was obtained by some undue influence," and other instructions were to like effect. We think the instructions were substantially correct, and if any ambiguity or uncertainty can be seen in them, it would be cured by appellant's, which fully instructed the jury on that point.

The wages that appellee received under the contract may look large when compared with the facts as they turned out at the end of the term of service. But no one could anticipate the enormous success the business would attain when looked at from the point of past experience of the creamery business of the appellant at the time when the contract was

made. Looked at from the past, the wages that appellee was to receive would not seem unreasonable. Again, the success of the business, as the evidence tended to prove, was largely due to the skill and efforts of the appellee, and if that were so, in a moral point of view and as well under his contract, he would be entitled to large compensation equally with the appellant. The evidence tended to show that a portion of the enormous profits were made by exertions of appellee in so manipulating the Elgin butter market on the board of trade, by purchasing small lots of butter for more than it would naturally sell for, and for more than it was offered to him, thus establishing a higher price for butter. In consequence the large quantities of appellant's butter on the market yielded $400 or $500 per day at times more than it would have done on a natural market. These transactions, as the evidence tended to show, took place under the tutelage and suggestions of appellant at a time when it is claimed that he was of an unsound mind.

The capital invested in the business in 1891 was about $85,000; in 1892, $120,000, and in 1893, $135,000. On this investment of capital there was realized as profits $35,841.59, $47,883.39, and $52,490.76 each year respectively.

Saying nothing of the morality of cornering the market and of the good luck in otherwise accumulating this large profit on so small an investment, it would seem that it would not be unreasonable that appellee, as his contract provided, should share in the profits, legitimate or otherwise, accumulated, a large part of which was through his exertions. As appellant and appellee operated together in these accumulations of profits, and as they were in partnership, it does not seem more unreasonable that appellee should receive more than could be earned by common wages, than that appellant should receive more than is ordinarily considered legitimate profit.

The jury heard the evidence in full and found for appellee. Allowing the latter the advantages that he is legally entitled to by reason of the verdict, we would not feel authorized to disturb it.

The judgment of the court below is therefore affirmed.